Jacque SNYDER, Individually and as Administratrix of the Estate of Harold D. Snyder, Plaintiff,

v.

ISC ALLOYS, LTD., a British Corporation, Defendant.

Eloise SIMON, Individually and as Administratrix of the Estate of John Simon, Deceased, Plaintiff,

v.

ISC ALLOYS, LTD., a British Corporation, Defendant.

Civ. A. Nos. 86–1512, 86–1513.

United States District Court, W.D. Pennsylvania.

Aug. 16, 1991.

---

Bernard J. McAuley, Pittsburgh, Pa., for plaintiffs.

David Smith, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

D. BROOKS SMITH, District Judge.

Plaintiffs Jacque Snyder and Eloise Simon filed these separate wrongful death and survival actions in which they seek to recover damages from ISC Alloys, Ltd. ("ISC").[1] Plaintiffs allege several theories of liability in their complaint including negligence, strict products liability and breach of warranty. The cases are now before the Court on ISC's motion for summary judg-

---

1. The decedents' estates had originally named the decedents' employer as a defendant. However, the Honorable Paul A. Simmons dismissed the cases against the employer because the actions were pre-empted by recovery pursuant to a prior workman's compensation proceeding. Judge Simmons recused himself from these cases on September 29, 1990, and they were reassigned to this Judge.

ment which requires the Court to address, *inter alia,* a question of first impression: Specifically, whether the package of designs, technical drawings and professional advice ISC sold decedents' employer constitute a product within the meaning of Section 402(A) of the Second Restatement of Torts. Because this Court concludes that the package of designs, technical drawings and information ISC supplied is not a product, ISC's motion for summary judgment is granted in part. There are, however, questions of material fact that cannot be resolved based on the record currently before the Court, and that preclude the Court from granting ISC's request for summary judgment on the theory of negligent design.

## I. The Facts

Decedents John Simon and Harold Snyder both worked at St. Joe's Resources Company ("St. Joe") in Monaca, Pennsylvania. Both sustained fatal injuries in 1985 when they entered a zinc dust plant located at St. Joe.

St. Joe operated the zinc dust plant pursuant to an exclusive licensing arrangement with defendant ISC Alloys, Limited ("ISC"), a British corporation. ISC developed and held patents on a process for converting solid zinc metal into zinc dust. In July of 1976, ISC granted St. Joe an exclusive license to use its process to manufacture zinc dust in the United States. Pursuant to the licensing agreement, ISC agreed to provide St. Joe with both the technical information and services necessary to use ISC's patented process. The technical information consisted of drawings illustrating the major components of the physical plant and an operating manual. The services provided by ISC to St. Joe consisted of advice during the design and construction of the plant. ISC personnel also trained St. Joe's employees to operate the plant once it had been constructed.

St. Joe hired an independent contractor who built the plant in accordance with ISC's specifications. The plant was completed in March 1978, and ISC provided personnel to train St. Joe's employees in the operation of the plant. St. Joe operated the zinc plant until December 1979 when poor economic conditions caused the company to close it. St. Joe then reopened the plant in July 1981.

On two separate occasions, St. Joe personnel visited the ISC zinc plant in Bloxwich, England, to observe the zinc dust process used there. ISC sent its own personnel to the St. Joe facility to train St. Joe's employees when the facility was first opened in March 1978, and again in July 1981 when the plant went back into operation. ISC did not, however, have a continuing role in the operation of St. Joe's zinc dust plant.

The zinc dust plant used ISC's electrothermal process to convert slabs of zinc into zinc dust. This is accomplished by first turning a slab of zinc into a zinc vapor which is then blown by fans into the condenser. There, the vapor is condensed into zinc dust. Because the zinc dust is explosive in nature, the oxygen content in the condenser unit is kept as low as possible to reduce the possibility that a zinc cloud might ignite. Consequently, during the process the condenser unit's atmosphere is composed primarily of carbon monoxide, thereby rendering that atmosphere potentially fatal to any human exposed to it.

The condenser unit must undergo occasional maintenance. The ISC Operating Manual states that the condenser must be cooled and the air inside ventilated before workers can enter to service the unit. (Defendant's Ex. D, § 3(e)(i)-(iii)).

On July 24, 1985, both Harold Snyder and John Simon died as a result of entering St. Joe's zinc dust plant condenser unit before it had been properly ventilated. ISC claims that St. Joe had altered the ventilation procedure recommended by ISC in its operating manual. (Defendant's Brief at 6) The St. Joe ventilation procedure consisted of opening the entry door to the condenser and inserting a dracco hose to ventilate the atmosphere for a period of one hour, and then testing for the presence of carbon monoxide. The person responsible for ser-

vicing the condenser also tested for the presence of carbon monoxide.[2]

On the morning of July 24, 1985, Harold Snyder, a trained zinc dust group leader, entered the condenser unit to perform routine maintenance. Snyder began his employment with St. Joe on September 30, 1982, and received his safety training from other St. Joe employees, not from ISC personnel. Snyder allowed the condenser to vent for approximately one-half hour before entering. While inside the condenser, he was overcome by the carbon monoxide and collapsed into a hopper at the bottom of the condenser unit.

The remaining zinc dust plant employees immediately made a call for emergency assistance, to which several St. Joe employees, including decedent John Simon, responded. Simon, who worked as a Larvik Oxide Packer in another plant at St. Joe's Monaca facility, volunteered to enter the condenser to save Snyder. Simon had never worked at the zinc dust plant and had never received any training or information regarding its operation.

Before entering the condenser, Simon donned a self contained breathing apparatus. This equipment included an oxygen tank which Simon wore on his back. Unfortunately, Simon could not get through the condenser door with the oxygen tank strapped to his back. He therefore removed the tank and climbed into the condenser. He was about to retrieve the mask connected to the oxygen tank when he was overcome by the carbon monoxide. Simon tumbled to the bottom of the condenser and fell into the hopper on top of Snyder.

Eventually, other St. Joe employees succeeded in entering the condenser with oxygen tanks strapped on their backs. They removed Snyder and Simon from the condenser unit. Harold Snyder died from carbon monoxide poisoning on July 24, 1985. John Simon likewise died from carbon monoxide poisoning on July 25, 1985.

The instant wrongful death and survival actions advance three theories of recovery: (1) negligence; (2) strict products liability; and (3) breach of warranty. Defendant ISC filed a motion for summary judgment in which ISC claims that it cannot be held strictly liable because the technical information and services it supplied to St. Joes do not constitute "products", and that it cannot be held liable under the two remaining theories because ISC did not owe a duty of care to the decedents.

## II. Analysis

Rule 56 of the Federal Rules of Civil Procedure allows a party to obtain summary judgment upon a showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ. 56(c). Summary judgment is not "regarded as a disfavored procedural shortcut but rather as an integral part of the Federal Rules." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). When reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). The primary issue raised by this motion for summary judgment, specifically, whether the plans ISC sold to St. Joe constitute a "product" within the meaning of section 402A, is a pure question of law. For the reasons set forth below, I will grant defendant ISC's motion for summary judgment on the 402A strict liability count, as well as on the breach of warranty count. I will also grant ISC's motion on the counts alleging that ISC was negligent in failing to adequately test the venting procedures and failing to provide adequate warnings regarding the hazardous conditions in the zinc dust condenser because the duty to implement proper safety procedures and provide warnings had, as a matter of law, passed to St. Joe at the time of the decedents' deaths. On this record, however, I must deny ISC's motion on the counts

---

**2.** ISC is correct that St. Joe changed the ventilation procedure. Whether the St. Joe procedure was qualitatively inferior to the procedure recommended by ISC is an issue that need not be reached here.

alleging that ISC was negligent in designing a defectively small access door.

These actions were brought pursuant to the Court's diversity jurisdiction. In diversity cases, federal courts must apply the choice of law principles of the forum state in determining which state's law will govern the substantive issues in the case. *Klaxon v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Blakesley v. Wolford,* 789 F.2d 236, 238 (3d Cir.1986). Therefore, this Court must follow Pennsylvania choice of law principles.

Pennsylvania has adopted a flexible interest analysis which requires the Court to determine which jurisdiction is "most intimately concerned with the outcome of [the] particular litigation," *Griffith v. United Airlines,* 416 Pa. 1, 203 A.2d 796, 806 (1964) (citations omitted), and then to apply the law of that jurisdiction. *Id. See also Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854 (1970); *Blakesley,* 789 F.2d at 238.

The parties seem to agree that the substantive law of Pennsylvania controls the disposition of this case.[3] The Court also concludes that Pennsylvania has the greatest interest in this case. Both decedents were residents of Pennsylvania and were injured and died in Pennsylvania. The decedents' heirs remain residents of Pennsylvania, and Pennsylvania has a significant interest in their welfare. This Court will therefore apply the substantive tort law of Pennsylvania.

## A. Strict Liability

Pennsylvania has adopted the doctrine of strict products liability as set forth in section 402A of the Second Restatement of Torts. *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966). Pursuant to this theory, a manufacturer who sells a product in a defective condition unreasonably dangerous to the user will be held liable for any injuries or damages that result even if the seller has used all possible care in the preparation and sale of the product. Restatement (Second) of Torts, § 402A(1)2(a). *Webb v. Zern,* 220 A.2d at 854. Since adopting section 402A, Pennsylvania Courts have taken an expansive, rather than restrictive, view of who may be held strictly liable for placing defective products in the stream of commerce. *See Abdul–Warith v. Arthur McKee & Co.,* 488 F.Supp. 306, 310 (E.D.Pa.) *aff'd,* 642 F.2d 440 (3d Cir.1980). Indeed, Pennsylvania Courts have imposed strict products liability for a defective product on all sellers in the chain of distribution. *See Bialek v. Pittsburgh Brewing Co.,* 430 Pa. 176, 187–88, 242 A.2d 231, 236 (1966) (plaintiff need not show which particular seller in the chain of commerce caused the defect); *Francioni v. Gibsonia Truck Corp.,* 472 Pa. 362, 372 A.2d 736, 738–740 (1977) (Pennsylvania Supreme Court held § 402A strict liability applicable to lessors in the business of leasing goods to the public); *Burch v. Sears, Roebuck,* 320 Pa.Super. 444, 467 A.2d 615, 621 (1983) (under Pennsylvania products liability law, "all suppliers of a defective product in the chain of distribution, whether retailers, part-makers, assemblers, owners, sellers, lessors or any other relevant category, are potentially liable to the ultimate user injured by the defect").

These cases have all addressed the issue of which defendants can be held liable for damage caused by a defective product. They do not, however, consider the definitional issue of what may be classified as a product pursuant to section 402A, and provide no guidance for resolving the question before this Court, which is whether a Pennsylvania Court would expand the applicability of section 402A strict liability to reach a defendant who sold designs and technical advice rather than a finished product. I must first predict, then, how the Supreme Court of Pennsylvania would resolve this novel question. *See Erie Castings Co. v. Grinding Supply, Inc.,* 736 F.2d 99, 100 (3d Cir.1984); *Lang v. New York Life Ins.,* 721 F.2d 118, 119 (3d Cir.1983). In doing

---

**3.** Defendant comes to this conclusion in its brief. Plaintiffs do not actually discuss the issue, but their brief is limited to a discussion of Pennsylvania law.

so, I must give proper regard to the decisions of Pennsylvania's intermediate courts. *Erie Castings*, 736 F.2d at 100. "The policies underlying the applicable legal doctrines, doctrinal trends indicated by these policies, and the decisions of other courts may also inform [my] analysis." *Id.* (citations omitted).

ISC contends that the license, technical drawings and information it sold to St. Joe do not constitute a product within the meaning of section 402A. ISC contends that what it sold to St. Joe is more aptly characterized as professional services, and thus beyond the reach of section 402A. I have reviewed the applicable Pennsylvania case law as well as the language of the Restatement itself and conclude that despite Pennsylvania's expansive treatment of who can be held liable under section 402A, ISC cannot be held strictly liable for decedents' death because the services ISC rendered do not constitute a product.[4]

As indicated above, I have not found any cases from the Pennsylvania Courts that set forth an analytical framework for determining what constitutes a product. However, in *Cox v. Shaffer*, 223 Pa.Super. 429, 302 A.2d 456, *allocatur denied*, (1973), the Pennsylvania Superior Court, relying on the actual language of section 402A, concluded that "[a] silo constructed in place on the employer's land is not the sale of a product." 302 A.2d at 457. The Superior Court held section 402A "inapplicable by its very clear language and [found] no need to resort to any extended reasoning to support [its] conclusion that a building so constructed on the site is not a product within the meaning of section 402A." *Ibid.* Thus, despite the Pennsylvania courts' apparent willingness to expand some facets of 402A liability, *Cox* clearly signals that Pennsylvania courts will not favor a broad definition of the word "product."

However, although I believe *Cox* supports defendants' claim that it did not supply a "product" within the meaning of section 402A, I do not believe it is dispositive of the instant case. Like the district court in *Abdul–Warith*, I see two limitations on the precedential value of *Cox*. First, as in *Abdul–Warith*, there are significant factual distinctions between this case and *Cox*.[5] Second, as was noted in *Abdul–Warith*, the laconic nature of the *Cox* opinion does not provide adequate guidance. *See e.g. Abdul–Warith*, 488 F.Supp. at 311–312 (noting that Superior Court's failure to elaborate the basis of its decision prevented the district court from conclusively determining what factors influenced the Superior Court's decision). In *Abdul–Warith*, the district court suggested that the Superior Court's opinion in *Cox* might stem from the fact that the silo was part of the realty and hence, not a product. Although I agree that this factor might have had some significance, I do not believe the *Cox* opinion can be construed so narrowly, nor do I believe that *Cox* is devoid of precedential value. On the contrary, I find that *Cox* favors a literal construction of the word "product" in keeping with the ideas set forth in section 402A of the Restatement.

Indeed, the *Abdul–Warith* opinion actually supports such a narrow interpretation of the word "product" in its discussion of the services exception to section 402A. The district court in that case noted that "where the architect or engineer simply provides the design or merely supervises, without actually participating in the construction of the challenged product, he has not been held strictly liable." *Abdul–Warith*, 488 F.Supp. at 310–311 n. 3. On the other hand, if the professional actually assembles or constructs the injury causing instrumentality, he will be subject to strict

---

4. There are other obstacles to holding ISC liable pursuant to section 402A. For example under 402A, a seller can be held strictly liable only if the product reaches the injured user unchanged. That is not what occurred here. ISC did not assemble the zinc dust plant and St. Joe changed the ventilation process by inserting a dracco hose through the entry door rather than lifting the explosion caps.

5. However, to the extent that the two cases can be distinguished, I believe that the injury-causing instrumentality, a silo, supplied by the defendant in *Cox*, is more akin to a product than the plans and information supplied by ISC in the instant case.

liability. *Id.* When these statements are evaluated together, as they must be, *Abdul–Warith* also recommends a fairly narrow reading of the word "product".

After considering the Superior Court's opinion in *Cox* and the analysis in *Abdul–Warith*, I do not hesitate to conclude that ISC's technical drawings, services and information with respect to the zinc dust plant do not constitute a product. As set forth more fully below, I reach this conclusion for two reasons. First, these items are not within the traditional meaning of the word "product". Second, these items are more aptly categorized as services.

I focus first on the proper interpretation of the word "product". Section 402A does not provide a definition of the word "product"; however, comment (d) provides that the rule applies to "an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair and an insecticide." Restatement (Second) Torts § 402A, comment (d) (1965). Although this list is hardly exhaustive, all of the examples in comment (d) have one trait in common: all are finished items with a tangible form. The allegedly defective item supplied by ISC was merely an idea, expressed and configured in language and symbols, and as such it clearly lacked the completeness and tangibility that characterized the "products" set forth in the list above. Given the literal approach espoused in *Cox* and the Restatement's list of examples, I do not believe mere ideas, information, communications and drawings can be considered products within the meaning of Pennsylvania law.

Moreover, to find ISC strictly liable pursuant to section 402A, I must not only ignore the difficulty of manipulating the definition of the word "product" to encompass the information ISC sold, but I must also ignore the undeniable fact that what ISC actually sold constituted services. Services, in turn, have traditionally been beyond the purview of section 402A. *See Abdul–Warith*, 488 F.Supp. at 310–311 n.

3; *LaRossa v. Scientific Design Co.*, 402 F.2d 937, 941–43 (3d Cir.1968).

According to the Third Circuit, the social policy which favors strict liability for the manufacturer of defective products simply does not favor holding service professionals strictly liable. *LaRossa*, 402 F.2d at 941.[6] Unlike mass produced goods, services are not marketed to a wide variety of the general public. Thus, parties injured by poor services are in a better position to locate the tortfeasor and identify the defect caused by the tortfeasor's negligence. *Id.* Therefore, as a general rule, those who sell professional services are not liable in the absence of negligence or intentional misconduct. *Id.* at 942.

Moreover, I cannot hold ISC strictly liable pursuant to section 402A in light of the fact that there is no allegation, nor evidence to support an allegation, that ISC mass marketed the zinc dust process technology. The evolution of mass marketing was a primary impetus in the creation of modern strict products liability. *See generally*, Prosser, "The Fall of the Citadel", 50 Minn.L.Rev. 791 (1966). The law of strict products liability has its roots in *Henningsen v. Bloomfield Motors*, 32 N.J. 358, 161 A.2d 69 (1960). In that case, the New Jersey Supreme Court held that "modern marketing conditions," whereby producers place goods in the stream of commerce and promote their purchase by the public, create an implied warranty that the product is safe for its intended use. 161 A.2d at 81. The *Henningsen* Court held that such producers are in the best position to either control the danger of the products or distribute any losses equitably, should they occur. *Ibid.* The Court therefore concluded that such manufacturers should be held strictly liable. *Ibid.*

Professor Prosser noted that by mass marketing products, manufacturers represent that the products are safe for use, and by packaging and advertising, manufacturers reinforce that belief. *See* Prosser, "The Fall of the Citadel", 50 Minn.L.Rev.

---

**6.** In *LaRossa,* the Third Circuit was analyzing the question of imposing strict liability against service professionals pursuant to New Jersey law. I believe, however, that in the absence of any authority from the Pennsylvania courts, the analysis in *LaRossa* is persuasive.

at 799. Thus, the fact of mass marketing, or at least some marketing, is an essential element of a claim of strict products liability. Indeed, the Restatement incorporates this notion in section 402A itself. Section 402A(1) requires that that defendant be "one who sells products", and subsection (2) further specifies that "the seller must be engaged in the business of selling such a product ..." *See* Restatement (Second) of Torts § 402(A)(1)(a). Comment (c) to section 402A states that the justification behind strict liability stems from the fact that "by marketing his product for use and consumption, [the seller] has undertaken and assumed a special responsibility toward any member of the consuming public...." The Restatement further notes that "public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production." Restatement (Second) Torts, § 402A, comment c.

The Restatement also teaches that, for liability to attach, a seller must also market the product on a somewhat consistent basis. Although it is not necessary for the seller to be engaged solely in the business of selling the defective product, an occasional seller cannot be held liable under section 402A. *See* Restatement (Second) Torts, § 402A, comment f.

Lacking guidance from the Pennsylvania Supreme Court on the question before me, I must consider the policy reasons cited generally in support of strict liability. The Pennsylvania Supreme Court has adopted section 402A, and in attempting to predict what that Court would do if confronted with the issue now before me, I must give proper weight to the policy underlying strict liability as embraced by the Restatement. In doing so, I cannot ignore the fact that there is no allegation, much less proof, that ISC ever marketed its technology to any party other than St. Joe. I will therefore grant defendant's motion for summary judgment on the count sounding in strict liability.

■ Even assuming *arguendo* that information ISC sold to St. Joe constituted a

product, I would still be compelled to dismiss the plaintiff's count alleging strict liability. Section 402A applies only where the product reaches "the user or consumer without substantial change in the condition in which it is sold." Restatement (Second) Torts § 402A(1)(b) (1965). Obviously, what ISC sold here—information—did not reach the decedents in substantially the same condition in which it was sold. That information did not cause them injury. On the contrary, the injury causing instrumentality, although derived from ISC's plans, had an existence completely separate and independent of ISC's plans. Thus, when ISC relinquished control over the item it sold—namely the plans—the thing that ultimately caused decedents' deaths did not yet exist. ISC did not even have a role in supervising the zinc plant's construction. Accordingly, it cannot be held liable pursuant to section 402A.

**B. Breach of Warranty**

■ I turn next to ISC's contention that it cannot be held liable for breach of warranty. ISC, relying on *Salvador v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 319 A.2d 903 (1974), contends that "the same legal relationship with the product which makes the defendant strictly liable for its defects also creates a cause of action against the defendant for breach of warranty." (Defendant's Brief at 9–10). Defendant therefore concludes that it cannot be held strictly liable under a breach of warranty theory "unless he had [sic] been the seller of a product." *Id.* Although I agree with defendant's ultimate conclusion—that it must have sold a "product" to be held liable for breach of warranty—this conclusion does not follow from its previous statement, nor from the *Salvador* opinion.

In *Salvador*, the Pennsylvania Supreme Court abolished the requirement of horizontal privity as an element of a breach of warranty case. The Court reasoned that this requirement was obsolete in light of its adoption of strict products liability as embodied in section 402A of the Restatement. Thus, the *Salvador* Court did draw an analogy between strict products liability in

tort and breach of warranty. However, the Supreme Court's analysis in *Salvador* discussed only the question of privity. It did not reach the further question of what types of injury causing instrumentalities can give rise to breach of warranty liability.

Despite this flaw in defendant's reasoning, I agree with ISC's ultimate conclusion that it cannot be held liable for breach of warranty because this theory of recovery is inapplicable to ideas, information and services. The concept of breach of warranty stems from Article 2 of the Uniform Commercial Code. *See Salvador v. Atlantic Steel Boiler Co., supra,* 319 A.2d at 905–908; Prosser & Keaton, *Torts,* 679–681 (5th ed. 1984). Article 2, in turn, governs the sale of goods. I believe that the goods covered by the U.C.C. are synonymous with the products covered by section 402A. I have already decided that ISC sold services rather than products. I have thus already implicitly decided that ISC did not sell "goods" within the meaning of Article 2. Accordingly, plaintiff cannot recover under a breach of warranty theory.

### C. Negligence

I turn finally to ISC's contention that it cannot be held liable for negligence in the deaths of John Simon and Harold Snyder. Plaintiffs' complaint alleges three different theories of negligence. First, plaintiffs allege that ISC failed to design a safe entry to the condenser. Next, the complaint alleges that ISC failed to adequately test the venting system. Finally, it is claimed that ISC failed to warn the ultimate users of the danger of the carbon monoxide in the condenser. ISC argues that it owed no duty of care to the decedents. Defendant offers a multitide of unfocused arguments to support its position. ISC first argues that the relationship between it and the decedents was not sufficient to give rise to a duty of care. Next ISC attempts to shift the liability to St. Joe because (1) it did not supervise the operation of the zinc dust plant; and (2) because the Licensing Agreement specifically relieved ISC from liability for any injury to any property or person caused by the operation of the zinc dust plant.

To prevail on a tort claim sounding in negligence, the plaintiff must prove that the defendant owed the plaintiff a duty of care. *See Wenrick v. Schloemann–Siemag, A.G.,* 523 Pa. 1, 564 A.2d 1244, 1248 (1989); *Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680, 684 & n. 5 (1983); *Gutzan v. Altair,* 766 F.2d 135, 140–142 (3d Cir.1985). "Duty, in any given situation, is predicated on the relationship existing between the parties at the relevant time ... and necessarily requires some degree of knowledge." *Morena,* 462 A.2d at 684 (citations omitted). However, mere knowledge of a dangerous situation will not give rise to a duty to act or warn. *See Schloemann,* 564 A.2d at 1248. Instead, the defendant's conduct must actually create the hazardous condition. Entering into a contractual arrangement may, however, be deemed to be conduct that creates a hazardous condition. "[A] party to a contract by the very nature of his contractual undertaking may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such manner that third persons—strangers to the contract—will not be injured thereby." *Evans v. Otis Elevator Company,* 403 Pa. 13, 18, 168 A.2d 573, 575 (1961); *see also Cantwell v. Allegheny County,* 506 Pa. 35, 483 A.2d 1350, 1353 (1984). Thus, as a general rule, "a company which manufactures and erects a structure owes a duty of care to people who must work in the vicinity of the structure." *Mathis v. United Engineers & Constructors, Inc.,* 381 Pa.Super. 466, 554 A.2d 96, 100 (1989). Inherent in this obligation, is the duty "to design the structure in such a way that it will not be rendered unsafe because of the foreseeable actions of a third party." *Id.* With these principles in mind, I turn to the question of whether ISC owed any duty of care to the decedents.

I can summarily dismiss ISC's first contention that it did not owe decedents a duty of care because they were not parties to the contract. *See Evans v. Otis Eleva-*

*tor, supra,* 168 A.2d at 575–576. Obviously, ISC knew that St. Joe would hire laborers to operate the zinc dust plant and, therefore, the law imposed a duty upon ISC to design a safe facility. *Id. See also Mathis v. United Engineers & Constructors,* 554 A.2d at 100.

In its second set of arguments, ISC attempts to shift liability from itself to St. Joe. Defendant first claims that it cannot be held liable because it did not supervise the daily operation of the zinc plant. In a related argument, ISC contends that "even if ISC may once have had a legal duty to ensure safe entry into the condensers at the St. Joe Zinc Dust Plant, the duty to prevent harm to employees threatened by ISC's negligent conduct had shifted from ISC to St. Joe by the time of plaintiff's decedent's deaths." (Defendant's Brief at 22). For the reasons set forth below, I agree that the duty to warn the employees about the lethal atmosphere in the condenser and the duty to implement proper safety procedures had shifted to St. Joe. I do not, however, accept ISC's further contention that either the passage of time, lack of control or contractual arrangements relieved ISC of its duty to design a safe entry to the condenser unit.

ISC suggests that the accident in which Harold Snyder and John Simon died was the result of inadequate supervision. (*See* Defendant's Brief at 18). ISC thus argues that because it was not involved in the daily operation of the unit, it cannot be held liable for any injury that resulted from St. Joe's poor supervision. To that end, ISC relies upon § 452(2) of the Restatement (Second) of Torts, which provides:

> where because of the lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of such person to prevent such harm is a superseding cause.

After reviewing the record, I conclude that St. Joe's supervision of the zinc dust plant was poor. I also agree that ISC had discharged its duty to warn end users about the potentially lethal atmosphere in the condenser unit and that St. Joe's departure from ISC's recommended ventilation procedure prevents the plaintiffs from holding ISC liable for failing to adequately test its venting procedures.

ISC correctly relies on section 452(2) of the Restatement for the proposition that either the lapse of time or some other event may shift liability for the actor's negligence to a third party. In *Guztan v. Altair Airlines,* 766 F.2d 135, 140 (3d Cir.1985), the Third Circuit noted that the Pennsylvania Supreme Court, relying on comment (d) to section 452, has set forth the following factors as relevant in determining whether the duty of care has shifted:

> The degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility, his knowledge of and the danger and the likelihood that he will not exercise proper care, his relationship to the plaintiff or to the defendant, the lapse of time, and perhaps other considerations.

The degree of the danger and the magnitude of the risk of harm were obviously great here. A function of the operation of the zinc dust plant was the creation of lethal atmospheric conditions within the condenser unit. However, the character and position of the third party weigh heavily against imposing liability against ISC. St. Joe was a sophisticated industrial manufacturer which knew of the danger posed by the condenser unit's atmosphere. Indeed, in the operating manual, ISC set forth specific safety guidelines which provided that

> no entry must be allowed until responsible laboratory staff have checked the condenser atmosphere and certified it as safe for entry. Oxygen content must be normal and the presence of carbon monoxide ruled out.

ISC's Electrothermal Zinc Dust Plant Erection and Operating Manual § 3(e)(iii) (Defendant's Exhibit D). ISC thus specifically warned St. Joe of the danger inherent in the zinc dust process.

Moreover, once warned of this danger, St. Joe was in the best position to both warn employees of the dangerous atmospheric condition and implement appropriate safety measures. Consequently, it was not likely that St. Joe would fail to exercise proper care by issuing adequate warnings and implementing safety procedures.[7] In fact, the record supports a finding that this was the case. St. Joe designed specific safety procedures for servicing the zinc dust condenser unit. (*See* Defendant's Exhibits M & N) Finally, as Simon and Snyder's employer, St. Joe had an obligation to warn decedents of the potential danger. Thus, ISC fulfilled its obligation to warn the third party controlling the daily operation of the zinc dust plant, St. Joe.[8] ISC could reasonably expect St. Joe to adhere to proper safety procedures and warn its employees about the potential hazards if those procedures were not followed. Thus, the duty to warn had shifted from ISC to St. Joe.

■ I also conclude that any liability arising from ISC's failure to test the venting procedures had shifted to St. Joe. ISC informed St. Joe that the condenser unit had to be ventilated before workers could safely enter to perform maintenance. Thus, St. Joe knew of the risks associated with improper ventilation. Moreover, as the operator of the zinc dust plant, St. Joe was best situated to devise and supervise the ventilation procedures. Under the circumstances, it was unlikely that St. Joe would fail to exercise due care.

Finally, and perhaps most importantly, St. Joe actually implemented a ventilation procedure that was substantially different than the procedure recommended by ISC. St. Joe had apparently used, without inci-

dent, its own ventilation procedure for some time prior to the accident which killed Snyder and Simon. Moreover, on the day of the accident, Harold Snyder failed to follow St. Joe's procedure. Given the lapse of time, St. Joe's supervision of the zinc dust plant, St. Joe's relationship with the decedents and the fact that St. Joe altered ISC's recommended procedure, it could not reasonably be concluded that but for ISC's negligence in failing to test the efficiency of its ventilation procedure, which was abandoned by St. Joe, the decedents would not have been killed. Indeed, St. Joe was not using ISC's ventilation procedure, but its own. Thus, any liability for failing to test the ventilation system had shifted to St. Joe at the time of the accident.

■ This shifting of liability theory cannot, however, be invoked to relieve ISC of liability with regard to plaintiffs' allegation that the actual design of the condenser unit was defective. Plaintiffs allege that ISC acted negligently by designing an entry door which did not easily allow laborers to gain access to the condenser while wearing breathing apparatus. This allegation of negligence is different in character than an allegation of negligence based on a failure to warn theory. ISC was solely responsible for the design of the unit. Its responsibility to design a safe unit did not end when St. Joe began to operate the unit. Although St. Joe may have been in the best position to provide warnings and implement appropriate safety procedures when it began to operate the plant, St. Joe was never in the best position to create a plant designed to function safely. To the contrary, St. Joe paid ISC to design a functional and safe facility. Given its reliance on ISC to provide the design, it is highly unlikely that St. Joe would have changed the design to

---

**7.** Indeed, as the decedent's employer, St. Joe had a duty to provide Simon and Snyder with a safe workplace which was free from unreasonable risks of harm. *See Industrial Union Department v. American Petroleum Institute,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980); *Meuller v. Jeffrey Mfg. Co.,* 494 F.Supp. 275, 278 (E.D.Pa.1980).

**8.** *See e.g. Suchomajcz v. Hummel Chemical Co.,* 524 F.2d 19, 26 (3d Cir.1975) (citing cases hold-

ing that manufacturers of dangerous chemicals can reasonably expect that corporations or individuals familiar with potentially dangerous chemicals will not be held liable for failing to warn the end user). Although ISC owed a duty of care to the decedents, ISC effectively discharged that duty by warning St. Joe about the dangerous atmosphere.

accommodate workers wearing breathing tanks.[9]

Moreover, St. Joe acted reasonably in not altering the design of the condenser unit door. Indeed, inasmuch as ISC's safety procedure provided "no entry may be made without a second person immediately outside to continuously watch the person inside ...", Operating Manual, § 3(e)(iv) (Defendant's Exhibit D), ISC contemplated that a laborer entering the unit might encounter problems necessitating rescue. The most obvious hazard a laborer might encounter would be carbon monoxide poisoning. If in fact the atmosphere remained lethal at the time of entry, a second person standing by could not effectuate a rescue without breathing apparatus. Thus ISC's admonition to have a second person standing by is a tacit guaranty that a worker could pass through the entry door while wearing breathing apparatus. Under the circumstances, it was entirely reasonable for St. Joe to rely on ISC to provide a safe design.

■ ISC claims, however, that section 14 of the Licensing Agreement "specifically contemplated that St. Joe would choose to alter or amend the zinc dust process over time to suit its particular needs." (Defendant's Brief at 16). Section 14 of the Licensing Agreement provides that if St. Joe made any improvements to the zinc dust process, that it would communicate those improvements to ISC. Section 14 thus obligates St. Joe to *share* any improvements. It does not, however, obligate St. Joes to *make* improvements, or to test the safety of the plant. Indeed, the improvements discussed in section 14 are commercial improvements, *i.e.*, those that would make the plant more productive and efficient. Hence, ISC cannot argue that section 14 shifted the duty to provide a safe design to St. Joe.

In summary, plaintiffs may proceed on the theory that ISC was negligent in designing a defectively small entry door. Given the fact that St. Joe paid for ISC's expertise in providing the design, St. Joe was not obligated to improve the design. The mere passage of time is not sufficient to shift liability for any faulty design from ISC to St. Joe.

■ ISC's final liability shifting argument is rooted in the text of the Licensing Agreement itself. Defendant claims that Sections 8.6.2(c) & (d) excuse it from any liability. *See* Defendants' Brief at 16–17. The Licensing Agreement does in fact purport to absolve ISC from any liability for injury to persons or property caused by circumstances over which ISC had no control. *See* Licensing Agreement § 8.6.2(c). However, ISC in fact had control over the design of the condenser door. Thus, section 8.6.2(c) is inapposite to whether ISC can be liable for a negligently designed door.

Section 8.6.2(d) provides that ISC cannot be held liable for "any occurrence whatsoever" once ISC had performed, or been released from performing the principal or secondary guarantee. The guarantees, in turn, relate to certain productivity levels. ISC contends that it cannot be held liable for the deaths of Simon and Snyder because they had performed the principal and secondary guarantees at the time of the accident. This contention is without merit.

Although parties may sometimes contractually alter traditional notions of liability via indemnity clauses, "under Pennsylvania law, indemnity is disallowed if the indemnitee is actively negligent." *DiPietro v. City of Philadelphia*, 344 Pa.Super. 191, 496 A.2d 407, 409 (1985); *Urban Redevelopment Authority v. Noralco Corp.*,

---

**9.** The different factual circumstances under which the decedents entered the zinc dust chamber appear, at first blush, to impact the ability of their executors to maintain their respective causes of action on the claim of negligent design. Unlike decedent Simon, decedent Snyder never attempted to enter the zinc dust chamber while wearing breathing apparatus, but instead, entered completely unprotected. Thus, the fact that the access door may have been too small to accommodate an individual wearing breathing apparatus, although highly relevant to Simon's death, initially seems irrelevant to Snyder's fate. However, had Simon been able to enter the zinc dust chamber protected by breathing apparatus quickly, Simon may have been able to rescue Snyder. These are questions of material fact that cannot be resolved on motions for summary judgment.

281 Pa.Super. 466, 422 A.2d 563, 565 (1980). Thus, "the law is well settled that the intention to include within the scope of an independent contract, a loss due to the indemnitee's own negligence must be expressed in *clear and unequivocal language.*" *Id.* 422 A.2d at 566 (emphasis added). Pursuant to this analysis, I must answer two questions. First, was ISC actively negligent and if so, second, whether the contract clearly and unequivocally excused ISC for its own negligence.

According to the Pennsylvania Supreme Court, active negligence is "negligence occurring in connection with activities conducted on the premises, as for example, negligence in the operation of machinery," whereas passive negligence "denotes negligence which permits defects, obstacles or pitfalls to exist upon the premises." *Potter Title and Trust Co. v. Young,* 367 Pa. 239, 242–243 80 A.2d 76, at 78–79 (1951). Although the Pennsylvania Supreme Court did not use these specific terms, I believe passive negligence relates to acts of omission whereas active negligence relates to acts of commission, because the Pennsylvania Courts have found active negligence only where the indemnitee created the dangerous condition. In the instant case, ISC created the dangerous situation by designing an entry which could not easily accommodate a laborer wearing breathing apparatus. It was thus actively negligent in failing to design a safe plant.

Section 8.6.2(d) does not expressly or unequivocally relieve ISC from liability for its own negligence. Instead, it purports to relieve ISC from liability once it has performed the principal and secondary guarantees. The breadth of section 8.6.2(d) may, at first blush, appear to relieve ISC of liability. However, the language lacks the kind of specificity necessary to clearly and unequivocally absolve ISC of liability for its own negligence. Therefore, the language of the Licensing Agreement was insufficient to shift liability for a negligently designed door to St. Joe.

██ Finally, I turn to ISC's contention that it cannot be held liable because it was not foreseeable that St. Joe would (1) alter the venting procedure; and (2) allow an untrained person to enter the zinc dust facility. ISC argues that although "a person with something approaching an apocalyptic frame of mind may imagine St. Joe could commit these acts, they are not 'foreseeable' merely because they could be thought to be possible." (Defendant's brief at 21.)

ISC apparently relies upon *Mathis v. United Engineers & Constructors, supra* 554 A.2d 96, to support its contention that these events were not foreseeable. I would, however, distinguish *Mathis* from the instant case. The plaintiff in *Mathis* was injured when he fell from a catwalk built by the defendant United Engineers & Constructors (UE & C). The catwalk blocked an access door to a holding tank, which plaintiff's employer needed to open periodically to clean the tank. Defendant therefore designed the catwalk so that the metal grates blocking the access door could be removed by burning the tackwelds.

Plaintiff's employer had removed the grates on at least two occasions prior to plaintiff's injury. Unfortunately, the workers who removed the grates failed to reweld the grates to the catwalk after their removal. Plaintiff was injured when the grates gave way while he traversed the catwalk.

The Superior Court held that defendant UE & C could not have foreseen the "exceptionally careless acts [*i.e.:* the failure to reweld], which occurred many years after UE & C had relinquished control of the catwalk to [plaintiff's employer]." *Mathis,* 554 A.2d at 100. The Superior Court therefore concluded "as a matter of law that UE & C was not negligent for failing to anticipate [plaintiff's employer's] misconduct." *Id.*

ISC's reliance on *Mathis* is misplaced. Although *Mathis* certainly supports ISC's earlier contention that its duty to provide adequate warnings and safety precautions shifted to St. Joe, *see* discussion, *supra,* it does not support relieving ISC of all liability. As discussed above, the plaintiffs allege that ISC was negligent in failing to design an access door that was large enough to accommodate a worker wearing breathing apparatus. Thus, they contend

that the actual design of the door itself was defective. *Mathis* did not discuss an actual defect in design, but a third party's—namely plaintiff's employer's—failure to maintain an initially safe design. Contrary to *Mathis,* the design in this case may have been initially unsafe. If this design was in fact defective as plaintiffs allege, then the defect was present in ISC's plans, and unlike *Mathis,* was not the result of St. Joe's negligence.

Thus, although it may not have been foreseeable that St. Joe would alter the venting procedure, or allow an untrained individual to effectuate a rescue, it was entirely foreseeable that some sort of accident necessitating rescue might occur. Moreover, it was foreseeable that such a rescue would need to be accomplished quickly by someone wearing breathing apparatus. The small size of the access door may have prevented an appropriately speedy rescue by an appropriately equipped worker. Thus, there is an issue of fact as to whether ISC's design was defective and whether it was a proximate cause of the deaths of Snyder and Simon.[10] Therefore, ISC's motion for summary judgment on the count alleging negligent design must be denied. An appropriate order will be entered.

### ORDER

AND NOW, this 16th day of August, 1991, it is hereby

ORDERED, that defendant ISC's motion for summary judgment on the strict liability and breach of warranty counts are GRANTED. It is further

ORDERED, that ISC's motion for negligent failure to warn or provide adequate safety guidelines is GRANTED. It is further

ORDERED, that ISC's motion for summary judgment on the theories of negligent design is DENIED.

---

10. ISC has not squarely raised the question of proximate cause in its motion, but instead relies entirely on a theory that it owed the decedents no duty of care. Because the issue of proximate cause has not been adequately raised, I do not reach the question.