974 F.2d 1331
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Elaine G. MASTALSKI; MICHAEL MASTALSKI, Plaintiffs-Appellants,
v.
INTERNATIONAL BUSINESS MACHINES CORPORATION, a/k/a IBM
Corporation, Defendant-Appellee.
 No. 92-1016.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 4, 1992
Decided: August 28, 1992
 
 Argued: Robert Alan Kosseff, Kosseff & Chaiken, Philadelphia, Pennsylvania, for Appellants.
 Francis Patrick Burns, III, Lavin, Coleman, Finarelli & Gray, Philadelphia, Pennsylvania, for Appellee.
 On Brief: Joel A. Dewey, Piper & Marbury, Baltimore, Maryland, for Appellee.
 Before MURNAGHAN and WILLIAMS, Circuit Judges, and TILLEY, United States District Judge for the Middle District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 Elaine Mastalski brought a products liability action against International Business Machines Corporation (IBM), alleging that she suffered permanent injury to the ulnar nerve in her right arm above the elbow from using a data entry machine sold by IBM to her employer, the Butterick Company of Altoona, Pennsylvania. Her complaint was filed on April 5, 1990 in the United States District Court for the District of Maryland and specified three causes of action: strict liability, negligence and breach of warranty. Jurisdiction is based upon diversity of citizenship, and Pennsylvania substantive law is applicable. Based on IBM's first motion for summary judgment, filed on October 5, 1990, the breach of warranty claim was dismissed on January 14, 1991 as barred by the statute of limitations.
 
 
 2
 Mastalski failed to answer IBM's expert interrogatories by a deadline set for December 7, 1990, and failed to present her experts for deposition by the January 1, 1991 deadline. IBM filed a second motion for summary judgment as to both the strict liability and the negligence claims, on the grounds that Mastalski: failed to identify any experts as required by the court's scheduling order; failed to answer IBM's discovery request for identification of any defect[s] in the product's design or manufacture; failed to identify any causal link between the alleged defect[s] and the alleged injury; and failed to offer facts showing that the product was unreasonably dangerous and defective. Mastalski's request for additional time both to identify experts and to respond to the summary judgment motion was granted. A single expert, Nachman Halpern, was identified, and Mastalski's answer to IBM's motion for summary judgment was filed on April 23, 1991. Halpern's deposition was taken by IBM. IBM then filed a reply brief in support of its motion for summary judgment on June 25, 1991. Mastalski did not file any additional submissions or requests, nor did she request such an opportunity.
 
 
 3
 The district judge granted IBM's motion for summary judgment on December 3, 1991. The court determined that, as a matter of law, Mastalski's expert had failed to establish the existence of a design defect such that the product could be deemed unreasonably dangerous. On that basis, the court granted summary judgment as to both the strict liability and the negligence claims, without reaching the issues raised by IBM. Mastalski has appealed from the December 3, 1991 memorandum and order. We now affirm.
 
 I.
 
 4
 The machine in question is an IBM 3742 Dual Data Station-a data processing machine that stands independently and contains two stations, each with a keyboard and a shared computer display screen. Sold to Butterick in 1978, five years after its introduction into the market by IBM, the product has not been the subject of any other legal proceeding based on an alleged defect.
 
 
 5
 Mastalski was employed by Butterick as a data processor using the IBM 3742 for Butterick for two years and two months (February 11, 1985 to April 8, 1987). Prior to that job, she had worked for Delta Computers, Inc., also as a data processor using the same computer, for a year and three quarters (May 24, 1983 to February 8, 1985). During the time she worked at Delta, she never complained about any pain associated with use of the machine. At Butterick, she worked from 6 a.m. to 2:30 p.m. Her job requirements included maintaining a keystroke average of 15,000 keystrokes per hour. In September 1986, while working at an average of 16,900 keystrokes per hour and performing overtime hours, she experienced physical fatigue and requested a wrist bandage from the company nurse. During the month of March 1987, she maintained a keystroke average of over 18,500 keystrokes per hour. Her time sheet indicates that, of the 256.9 hours that she recorded for all her work tasks, she worked 158.6 regular hours and 36.5 overtime hours at the keyboard. She did not notice any pain or discomfort during March.
 
 
 6
 Mastalski alleged that in the first week of April, 1987, she felt pain, numbness and tingling in her right arm and hand. On April 8, she saw the Butterick company physician, Dr. Phillip Hoovler, who recommended that she cease working. Since that time, she has not returned to work at Butterick. She has received workers' compensation benefits through Butterick.
 
 
 7
 Pain and discomfort, including a burning sensation, numbness and tingling, continued. Another physician, Dr. Glenn Buterbaugh, diagnosed her problem as ulnar nerve neuropathy secondary to compression at the cubital tunnel. On September 17, 1987, Dr. Buterbaugh performed an ulnar nerve transposition, a surgical procedure to relieve the pain, but Mastalski has alleged that significant pain has continued. Further surgery has been discussed.
 
 
 8
 The claim based on strict liability in tort alleged that the product was unreasonably dangerous because it was defectively manufactured, designed, assembled and constructed, and also was defective because of inadequate warnings. The claim based on negligence alleged that IBM failed to use reasonable care in designing, manufacturing, constructing and assembling the product, and also in failing adequately to warn users against special dangers created by use of the machine. She alleged that such defects and negligence caused her permanent disabling injuries, including right ulnar nerve neuropathy, a partially frozen right shoulder and repetitive stress syndrome.
 
 
 9
 In responding to IBM's motion for summary judgment, Mastalski offered the opinions of her expert, Halpern. He evaluated the IBM 3742 and Mastalski's injuries. He concluded that the machine was defectively designed, based on the following alleged defects: the placement of the display screen, the flatness of the keyboard, the height of the work surface, the lack of sufficient wrist support, the steep angle of the keyboard, and the layout of the keys. He posited that those alleged defects required Mastalski to be in an "awkward" position that resulted in compression to her ulnar nerve at the elbow. He concluded that the defects were "a substantial factor" in causing her injuries because her nerves were compressed.
 
 II.
 
 10
 Mastalski argued before the trial court, and has argued now on appeal, that the determination as to whether a product is "unreasonably dangerous" or defective may only be made after the plaintiff has presented all of her evidence at trial, and may not be made upon a motion for summary judgment. The argument was rejected by the trial court, and is now rejected by us on appeal.[1]
 
 
 11
 The law of Pennsylvania does not require that a court wait until the plaintiff puts on her evidence at trial before determining whether a product is "unreasonably dangerous" as a matter of law. The theory of strict liability found in the Restatement (Second) of Torts, § 402A, and adopted by the Supreme Court of Pennsylvania in Webb v. Zern, 422 Pa. 424, 427, 220 A.2d 853, 854 (1966), requires proof that (1) the allegedly defective product is "unreasonably dangerous" and (2) the alleged defect caused the plaintiff's injuries. Azzarello v. Black Bros. Co., 480 Pa. 547, 554, 391 A.2d 1020, 1024 (1978). Determination of whether a product may be labeled "unreasonably dangerous" is a judicial responsibility, requiring the trial court to decide as a matter of law whether the jury should be permitted to consider the theory of liability. Mackowick v. Westinghouse Electric Corp., 525 Pa. 52, 575 A.2d 100 (1990). That threshold determination must be made by the court whether the alleged defect is a design defect, a manufacturing defect, or a failure to provide adequate warnings. Id. That determination may be made upon a motion for summary judgment. See Griggs v. BIC Corp., 786 F. Supp. 1203 (M.D. Pa. 1992) (granting defendant's motion for summary judgment on the ground that a disposable, butane lighter without a child-proof device was not unreasonably dangerous under Pennsylvania law).
 
 
 12
 The three cases cited by the district court in rejecting Mastalski's argument that the determination could not be made prior to trial are Shetterly v. Crown Controls Corp., 719 F. Supp. 385 (W.D. Pa. 1989), aff'd 898 F.2d 139 (3d Cir. 1990); Snyder v. ISC Alloys, Ltd., 772 F. Supp. 244 (W.D. Pa. 1991); and Gunsalus v. Celotex Corp., 674 F. Supp. 1149 (E.D. Pa. 1987). Mastalski has contended that the latter two cases do not support the position that whether a product is unreasonably dangerous can be determined at summary judgment, based on her claim that neither court was faced with the issue. Conceding that Shetterly is on point, she has contended that Shetterly is "internally inconsistent" and therefore "cannot properly serve as the foundation" for the trial court's grant of summary judgment.
 
 
 13
 We are not persuaded by either of Mastalski's attempts to prove that it was premature to decide the issue on summary judgment when Mastalski had presented for the hearing on summary judgment insufficient evidence to permit a jury finding in her favor. The district court properly rejected Mastalski's contention.
 
 
 14
 Shetterly is a thoughtful and thorough opinion in which the district court resolved eight complaints of strict products liability by dismissing the complaints. 719 F. Supp. at 403. The complaints were brought by injured grocery warehouse employees who alleged strict products liability against the manufacturer of a pallet truck used in a grocery warehouse. The district court explained that its obligation under Pennsylvania law was to make a social policy determination, as a threshold matter, as to whether the product was "unreasonably dangerous," based on specific factors. Id. at 386. The court held a fact hearing and went to view the truck. Concluding that the plaintiffs had made a prima facie showing that the design of the product caused their injuries, the court determined that the burden then shifted to the defendant to show that the product was not defective, i.e., that its utility outweighed its risks such that it could not be deemed unreasonably dangerous. Id. at 388. The court concluded that there was an inherent danger in using the truck, but recognized that an inherent danger does not by itself render a product either defectively designed or unreasonably dangerous. Id. at 403. The court considered the factors identified by Pennsylvania courts as relevant to the social policy decision, and concluded that, as a matter of law, the utility of the product far outweighed the risk of harm. Id. Also, as a matter of both law and fact, the court concluded that the trucks were not unreasonably dangerous and not in a defective condition. Id. Thus, the district court resolved the issue upon the defendant's motion to dismiss, and that decision was affirmed by the Third Circuit. 898 F.2d at 139.
 
 
 15
 There is no basis to Mastalski's claim on appeal that Shetterly is "internally inconsistent" so that the district court improperly relied upon it here. The alleged inconsistency is based on the Shetterly court's citation of a Pennsylvania case for the point that the court must make the determination as to whether the product is unreasonably dangerous "based on the facts presented at trial." Id. at 388 (citing Ellis v. Chicago Bridge & Iron Co., 376 Pa. Super. 220, 545 A.2d 906 (1988) (emphasis in original)). Relying upon the words "at trial," Mastalski has argued that the making of a pre-trial determination as to the issue contravenes Pennsylvania policy. Yet the district court in Shetterly cited that passage for the point that the determination must be based upon factual evidence. That would be the case pre-trial or at trial. The court went on to make a pre-trial determination that the evidence was insufficient as a matter of law to establish a defective design and an unreasonably dangerous product. The court in Shetterly did not improperly ignore Pennsylvania law. It simply cited a passage from a case in which the court discussed a determination that had been made after the facts were presented at trial. The referenced passage did not establish that, even when there was an insufficiency of matters of a factual nature, there was a requirement that the determination should only be made after the facts are presented at trial.
 
 
 16
 Perhaps Snyder is not exactly on point. Gunsalus, on the other hand, is mischaracterized by Mastalski, because the district court did make a pre-trial determination as to whether the record was sufficient to support a claim that a product was defective and thus unreasonably dangerous. Gunsalus, 674 F. Supp. at 1158. The particular claim at issue in Gunsalus involved a strict products liability claim against a cigarette manufacturer based on an alleged design defect making the cigarettes unreasonably dangerous. The cigarette manufacturer moved for summary judgment, alleging that there was no evidence the product was defective. The court quoted Comment (i) of the Restatement (Second) of Torts, § 402A at length to establish that the risk of harm from the over-consumption of a product is inherent in all products, and that whether a product is "unreasonably dangerous" therefore requires a defective condition. Gunsalus, 674 F. Supp. at 1158. That cigarettes cause lung cancer thus was insufficient to prove that they are "defective." Id. The court therefore concluded that the only "design defect" alleged by plaintiff was the failure to warn of the dangers. Id. The claim of failure to warn based on post-1966 sales was thereupon held to be preempted by federal law. Id. at 1159. Mastalski has mischaracterized the court's analysis when she claims that Gunsalus does not support the proposition that a court can make a determination as to unreasonable dangerousness on summary judgment. She has sought to emphasize that the court granted the motion for summary judgment as to the strict products liability claim based solely on its finding of preemption. That, it is true, was the holding. However, the court first determined that the factual record before it on the motion for summary judgment was insufficient as a matter of law to support a claim that the product was "unreasonably dangerous" based on any "defect" inherent in the product itself. Id. After that determination, the court turned to its identification of the asserted defect as the failure to warn, and concluded that a claim based on a failure to warn was preempted. Id. at 1158-59.
 
 
 17
 As further support for her untenable argument, Mastalski has pointed to the following passage in Azzarello v. Black Brothers Co., 480 Pa. 547, 558, 391 A.2d 1020, 1026 (1978):
 
 
 18
 [T]he phrases "defective condition" and"unreasonably dangerous" as used in the Restatement formulation are terms of art invoked when strict liability is appropriate. It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint.
 
 
 19
 Mastalski has argued that the "plain import" of the passage is that the judicial determination as to unreasonable dangerousness can only be made "after 'plaintiff's averment of the facts' at trial is completed." Yet there is simply no basis to conclude that the Pennsylvania Supreme Court intended to mandate what would in effect be a complete abdication of judicial responsibility to employ summary judgment to determine whether there is sufficient evidence to support a claim as a matter of law. The passage in Azzarello states that the case can only go to the jury after a determination that there are disputes of fact which have been made. That simply cannot be read to mean that the determination is only to be made after the plaintiff presents all of her evidence at trial. There must be a sufficiency of disputed fact to withstand summary judgment. Fed. Rule Civ. Proc. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
 
 
 20
 Mastalski also has cited Dambacher by Dambacher v. Mallis, 336 Pa. Super. 22, 485 A.2d 408 (1984), appeal dismissed, 508 Pa. 643, 500 A.2d 428 (1985). In Dambacher, the Pennsylvania Superior Court stated that the defendant may move for the trial court to make an explicit ruling as to the threshold social policy determination required in Azzarello, but that, "[i]n the absence of such a motion, it will be presumed that the court, by permitting the case to go to the jury, resolved the threshold determination against the defendant." Dambacher, 336 Pa. Super. at 51 n.6, 485 A.2d at 423 n.6. Again, however, Mastalski simply has read too much into the passage when she tries to persuade us that the only point at which such a motion may be made is at the close of a plaintiff's case, or at the close of all the evidence at trial.
 
 
 21
 Mastalski next has turned to the contention that a trial court's engagement in the determination of whether a product is "unreasonably dangerous" during the discovery stage is"wholly premature" because it places "an unduly harsh burden" on a plaintiff to prove the case solely through discovery. She has argued that the factors to be weighed on the issue of design defect[2] require the court to hear testimony and view demonstrative evidence, and that direct examination of her expert at trial would allow for full illumination of his opinions, for presentation of additional empirical studies, and for testimony by others with similar injuries. On that basis, she has urged us to find that the trial court was required to allow her to present her evidence at trial. She claims that her submission of her expert's report, specifying the alleged defects making the machine unsafe, was sufficient to meet her burden at the summary judgment level under Celotex Corp. v. Catrett, 477 U.S. 317 (1986), and Federal Rule of Civil Procedure 56.
 
 
 22
 Yet she was accorded ample opportunity to submit any such empirical evidence to support her claim in opposition to the motion for summary judgment. She chose to rely solely on the basis of her expert's report, with full knowledge of the fact that IBM had conducted a deposition which severely discredited the basis of his opinions. She had the opportunity to submit the medical data which she has alleged would have further supported the expert's opinion, and to identify others who allegedly suffered similar injuries. She did not do so. No attempt, by request or otherwise, to make further submissions of evidence to support her claim was made.
 
 
 23
 IBM's motion for summary judgment was based on the absence of evidence as to the product's unreasonable dangerousness and defectiveness; the absence of proof on the issue of causation; and the absence of a qualified expert. After IBM demonstrated that there was an absence of genuine issues of material fact, the burden shifted to Mastalski to set forth proof that would permit a reasonable jury to return a verdict in her favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The district court held that the opinions of her expert were "not sufficient to avert summary judgment because they do not rise above theoretical, unsupported speculation."
 
 
 24
 Mastalski has pointed to the fact that Halpern identified several defects in the machine's design that, he concluded, substantially contributed to her injury. On that basis alone, she has claimed that she raised genuine issues of material fact that are in dispute and that are sufficient to avoid the grant of summary judgment in favor of IBM.
 
 
 25
 The district court's decision was, nevertheless, correct. A district court may grant a motion for summary judgment if the only evidence to support the claim is an expert's theory of injury that has no basis in the record. See Merit Motors, Inc. v. Chrysler Corp., 569 F.2d 666 (D.C. Cir. 1977) (an expert's opinion as to injury from an antitrust violation was based only on theoretical speculations and was the sole basis of the plaintiff's allegations; holding that the district court properly granted summary judgment, as the plaintiff is not entitled to get to trial in the hope that some evidence would support the expert's theory); Viterbo v. Dow Chemical Co., 826 F.2d 420, 424 (5th Cir. 1987) (an expert opinion that is not reliably supported is not to be submitted to a jury, and summary judgment can be granted).
 
 
 26
 The only evidence offered by Mastalski to support the claim that the product was unreasonably dangerous due to a design defect was Halpern's opinion. The basis of his theory was that the defects in the design of the workstation required her to be in an"awkward" position that caused damage to the ulnar nerve at her elbow. Yet Halpern's opinion was not based on any identifiable facts. He could not identify a single study or any clinical data that drew a link between the design of the machine, the position she maintained while working at the machine and the ulnar nerve injury at her elbow. Nor did Halpern conduct any research to substantiate his theory. Mastalski herself also failed to point out any medical literature supporting her theory as to the alleged design defect. Halpern acknowledged at the deposition conducted by IBM that he had no medical literature or data to support his "hypotheses," but that he extrapolated from studies conducted on other parts of the body, such as the shoulder, to opine as to what may have caused the injury to Mastalki's elbow. His theory of the defects in the workstation and the causation of her injury could properly be dismissed as speculation that was unsubstantiated by any factual evidence in the current medical literature or the record.
 
 
 27
 On the other hand, Halpern opined that Mastalski's injury was also caused by the hourly typing rate and the amount of typing time required by Mastalski's employer, Butterick. An injury resulting from a requirement to maintain long hours and a fast pace would be more akin to harm from the overconsumption of an otherwise relatively safe and non-defective product, such as a tennis racquet. See Gunsalus v. Celotex Corp., 674 F. Supp. 1149, 1158-59 (E.D. Pa. 1987) (discussing Restatement (Second) of Torts,s 402A, comment (i)). Halpern would not suggest any relative breakdown between the two factors which he claimed caused the injury, i.e., (a) the work practices attributable to Butterick, and (b) the equipment design for which IBM was responsible. The most that Halpern could do was to conclude that the alleged design defects were a"substantial factor."[3]
 
 
 28
 Although it may well be that, in the future, scientific studies may become available that would suggest a link between the design of the workstation and the injury, any attempts at the efficient administration of justice would be futile were we to require district courts to hold off on deciding a motion for summary judgment merely because of a plaintiff's hope that additional scientific research will become available by the time of trial.[4] The evidence, even when considered in the light most favorable to Mastalski, was insufficient as a matter of law to establish that the IBM workstation's design was defective and thus "unreasonably dangerous." Because proof of a defect and the causation of injury are elements of a products liability claim grounded in either strict liability or negligence, Dambacher by Dambacher v. Mallis, 336 Pa. Super. 22, 53, 485 A.2d 408, 424 (1984), appeal dismissed, 508 Pa. 643, 500 A.2d 428 (1985), failure to prove those elements is fatal to both claims. Therefore, summary judgment in favor of IBM was properly granted.
 
 Accordingly, the judgment is
 
 29
 AFFIRMED.
 
 
 
 [1]
 Neither party has raised the question of whether the district court, as a federal court hearing the case under diversity jurisdiction, would even be required to follow such a policy, assuming that Mastalski's argument was a correct interpretation of Pennsylvania law as to the proper timing for determining whether a product may be "unreasonably dangerous" as a matter of law. However, because we disagree with Mastalski's contention, we do not address the question of whether, under Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), and its progeny, such a policy would be considered substantive, and thus applicable, or procedural, and thus not applicable if it conflicted with federal rules of procedure
 
 
 [2]
 The factors to be considered include the usefulness of the product to the user and public; the likelihood it will cause injury and probable seriousness of any injury; availability of substitutes to meet the same need that are less unsafe; the maker's ability to eliminate the unsafe features without making it too expensive or impairing its utility; ability of user to avoid the danger by exercising care in use of product; general knowledge as to dangers inherent in use of the product, or existence of adequate warnings; ability of maker to spread loss through price of product or liability insurance. See Shetterly, 719 F. Supp. at 387
 
 
 [3]
 The district court stated that it was granting summary judgment solely due to the lack of evidence as to the existence of a design defect rendering the machine unreasonably dangerous, and that it was not necessary to reach the issue of causation. Yet some of the deficiencies in Halpern's opinion identified by the district court appear to us to be relevant more to causation than to the existence of a defect. For example, the court noted that "there is a dearth of support for Mr. Halpern's theory about the connection between ulnar nerve therapy at the elbow and data processing," that he failed to identify any studies "linking any job task to nerve injuries," and that he failed to distinguish between the employer's work practices as a cause of injury and the alleged design defect as a cause
 The elements of the existence of a defect and causation are often interrelated in that a product can cause harm without being defective, Gunsalus, 674 F. Supp. at 1158, yet factors in determining whether a product is defective include the likelihood that it will cause injury and the extent of general knowledge as to the likelihood that harm will be caused, Shetterly, 719 F. Supp. at 387. While we affirm the grant of summary judgment, we do so on the basis of both a lack of evidence as to a design defect and as to lack of causation.
 
 
 [4]
 The lack of research to support Mastalski's claim is highlighted by the fact that, shortly after oral argument was heard in the instant case, United States District Judge Weinstein of the Southern District of New York granted a motion to consolidate forty-four cases involving claims of "repetitive stress injury" then pending before various judges in his district, based in part on the fact that the scientific information that may support such claims has not as of yet been developed. In re Repetitive Stress Injury Cases Pending in the United States District Court for the Eastern District of New York; Burrough v. Northern Telecom, Inc., 60 U.S.L.W. 2783, 15 O.S.H. Cas. (BNA) 1696, 1992 WL 119942 (E.D.N.Y., June 2, 1992) (purposes given to justify the consolidation were, inter alia, that courts can minimize litigation costs "when scientific information concerning injuries and causation and the legal theories of the case are developed at an early stage of the litigation," and that early consolidation would enable both the courts and the parties "to obtain access to and encourage development of scientific and other relevant information")