**KALUMETALS, INC., and Tribometics, Inc., Plaintiffs,**

v.

**HITACHI MAGNETICS CORPORATION, Defendant.**

**No. Civ.A. 97–949.**

United States District Court,
W.D. Pennsylvania.

Oct. 14, 1998.

John W. Pollins, III, Greensburg, PA, Joel B. Albert, William R. Tighe, Pittsburgh, PA, Robert A. Stutman, P.C., for Plaintiffs.

Mark T. Caloyer, Raymond J. Conlon, Pittsburgh, PA, for Defendant.

## OPINION

ZIEGLER, Chief Judge.

Pending before this court is the motion of defendant, Hitachi Magnetics Corporation ("Hitachi"), for summary judgment pursuant to Fed.R.Civ.P. 56(c). Plaintiff Kalumetals, Inc. ("Kalumetals") commenced this civil action alleging that, as a result of an explosion which occurred in a drying furnace while Kalumetals was processing a shipment of cobalt samarium grinding sludge for Hitachi, Kalumetals suffered property damage and loss of business income. Plaintiffs' Amended Complaint adds the allegation that Tribometics, Inc. ("Tribometics"), a tenant in Kalumetals' building at the time that the alleged damage occurred, suffered business loss as a result of the explosion.

Plaintiffs' Second Amended Complaint asserts three counts: Count I, Negligence; Count II, Breach of Contract; and Count Three, Strict Liability. Defendant specifically seeks judgment as to counts II and III. Defendant also seeks summary judgment, apparently with regard to the case in full, as a sanction for plaintiffs' failure to preserve evidence related to the case. For the reasons that follow, Hitachi's motion for summary judgment will be denied.

### I. The Facts

Kalumetals was retained by Hitachi in May, 1993, January, 1994 and June, 1994, to dry a grinding swarf comprised of fine metallic grindings and grinding fluid. On each of these occasions, Kalumetals dried the swarf, known as "Hicorex swarf," without incident.

In May, 1995, Hitachi again requested that Kalumetals dry a shipment of Hicorex swarf. Up until this time, Kalumetals had dried the swarf in an open furnace system. On this occasion, however, Kalumetals intended to dry the swarf in a closed retort system. In or around May, 1995, Kalumetals successfully dried a test amount of the Hicorex swarf in the closed system furnace, allegedly without incident.

On or around June 6, 1995, Hitachi sent Kalumetals the balance of the shipment of what Kalumetals believed to be Hicorex swarf. At least one of Hitachi's earlier shipments of the Hicorex swarf had been accompanied by a material safety data sheet ("MSDS"), in which Hitachi described the product as "CoSm"[1] and cautioned users/handlers to "minimize contact with air and moisture" to avoid spontaneous reaction. The drums in which the June 1995 product was shipped were not labeled in such a way as to indicate that their contents may have been flammable or otherwise hazardous.

On or around June 9, 1995, Kalumetals began the drying process by loading fifteen retort tubes with the product that it believed was Hicorex swarf. Approximately eight hours later, one of the retort tubes exploded, destroying the furnace and propelling the tube across Kalumetals' plant.

Kalumetals alleges that particles of wax and Neodymium–Iron–Boron ("NdFeB"), another product manufactured by Hitachi, contaminated the CoSm, and that Hitachi failed to properly notify Kalumetals of the content of the swarf for processing. Hitachi counters by asserting that the MSDS properly stated that other rare earth minerals were present in the swarf, and that such labeling accounted for the possibility that NdFeB could be present in the swarf.

Kalumetals further alleges that the MSDS was erroneous and gave incorrect safety instructions, recommending that the processor keep it away from moisture when the better course of action would have been to keep the swarf underwater until the NdFeB oxidized the contained hydrogen.

## II. Analysis

### A. Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for sum-

mary judgment, we must examine the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Choice of Law

The instant action was initiated pursuant to the court's diversity jurisdiction. "In diversity cases, federal courts must apply the choice of law principles of the forum state in determining which state's law will govern the substantive issues in the case." *Snyder v. ISC Alloys, Ltd.,* 772 F.Supp. 244, 249 (W.D.Pa.1991), *citing Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Blakesley v. Wolford,* 789 F.2d 236, 238 (3d Cir.1986). Accordingly, we must follow Pennsylvania choice of law principles.

The Pennsylvania flexible interest analysis allows the court to determine which jurisdiction is "most intimately concerned with the outcome of [the] particular litigation." *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796, 806 (Pa.1964) (citations omitted). The court is then required to apply the law of that jurisdiction. *Id. See also Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854 (Pa.1970), *Blakesley,* 789 F.2d at 238.

As all of the parties have relied principally on Pennsylvania law in their papers, it appears that they have determined that Pennsylvania law controls the outcome of the substantive issues. We agree. Kalumetals is a Pennsylvania corporation with a principal place of business in Pennsylvania. Tribometics also has a principal place of business in Pennsylvania. The injury to plaintiffs which led to the commencement of this suit arose in Pennsylvania. The Commonwealth of Pennsylvania has a significant interest in the welfare of plaintiffs. We will therefore apply the substantive law of Pennsylvania to our analysis.

---

1. Hicorex swarf is generated by Hitachi's grinding of samarium-cobalt permanent magnet components produced in a powder metallurgical manufacturing operation. Accordingly, the Hicorex swarf is principally comprised of cobalt and samarium ("CoSm").

## C. *Strict Liability Claim*

We will first address Hitachi's motion for summary judgment with respect to plaintiffs' strict liability claim. In *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (Pa.1966), Pennsylvania adopted the doctrine of strict products liability as set forth in section 402A of the Restatement (Second) of Torts. Section 402A provides that a manufacturer who sells a product in a defective condition unreasonably dangerous to the user will be held liable for any damages that result from the consumer's possession of that product, even if the manufacturer/seller has used all possible care in the manufacture and sale of the product. *See Snyder*, 772 F.Supp. at 249.

### 1. *Plaintiff Tribometics' Claim Under Section 388*

Initially, we note that plaintiff Tribometics offers an argument for strict liability under Restatement (Second) of Torts § 388. Tribometics bases this argument on a reading of *Binder v. Jones & Laughlin Steel Corp.*, 360 Pa.Super. 390, 520 A.2d 863 (Pa.Super.), *appeal denied*, 516 Pa. 631, 533 A.2d 90, and *appeal denied*, 516 Pa. 634, 533 A.2d 92 (Pa.1987). We disagree with Tribometics' interpretation of *Binder*, and find instead that that case involved a negligence claim and makes no mention of strict liability.

Section 388, which concerns chattels known to be dangerous for intended use, presents negligence rules. *See, e.g., Incollingo v. Ewing*, 444 Pa. 263, 299, 282 A.2d 206 (Pa.1971) (negligence principles as set forth in section 388, rather than strict liability principles, are applicable to a case which turned upon the adequacy of a warning as to the dangerous side effects of a drug). Pennsylvania courts have found that a claim under section 388 charges improper conduct, rather than the existence of a defective product. *See, e.g., Harford Mut. Ins. Co. v. Moorhead*, 396 Pa.Super. 234, 578 A.2d 492, 501 (Pa.Super.1990) ("Pennsylvania courts consistently analyze the negligence/failure to warn and

strict liability/failure to warn causes of action separately, treating conduct-related counts apart from product-related counts."), *appeal denied*, 527 Pa. 617, 590 A.2d 757 (Pa.1991).[2] Thus, the proper place for plaintiffs to offer an analysis under section 388 is through their negligence claim. The argument is not applicable here.

### 2. *Defendant's 402A Summary Judgment Arguments*

We do not believe that defendant is entitled to summary judgment with regard to plaintiffs' claim of strict liability under Restatement (Second) of Torts § 402A. Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Drawing all reasonable inferences in favor of Kalumetals, we find that Hitachi is the type of supplier contemplated by section 402A, and that the swarf that Hitachi provided to Kalumetals is a product in a defective condition unreasonably dangerous to the user.

In its motion, defendant presented four primary reasons for its belief that section 402A does not apply: (1) the transaction at issue was a service transaction; (2) Hitachi

---

**2.** Note, however, that the distinction between negligence and strict liability has not been made in cases involving "unavoidably unsafe products," such as prescription drugs, under comment k to section 402A of the Restatement (Second) of Torts. *See, e.g., Mazur v. Merck & Co., Inc.*, 964 F.2d 1348, 1355 (3d Cir.1992) (applying Pennsylvania law), *cert. denied*, 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992). No such unavoidably unsafe product is at issue here.

cannot be considered a seller under 402A; (3) the swarf does not constitute a product under 402A; and (4) that the parties had equal bargaining power and operated in a commercial setting. We will address each of these reasons in our analysis.

### a. Alleged Defect Was In Product, Not Service

 We are not persuaded by Hitachi's argument that the transaction at issue is a service transaction. Hitachi, citing *Snyder*, 772 F.Supp. at 251, correctly argues that strict liability is simply not applicable to service transactions. *See also Abdul–Warith v. Arthur G. McKee & Co.*, 488 F.Supp. 306, 310–11 (E.D.Pa.1980), *aff'd* 642 F.2d 440 (3d Cir.1981); *LaRossa v. Scientific Design Co.*, 402 F.2d 937, 941–43 (3d Cir.1968) (applying New Jersey law). *Snyder*, however, presents a different set of facts. There, the court was called upon to determine whether a defective license, technical drawings and information sold from a licensor to licensee constituted products for the purposes of section 402A. The court concluded that the items in question were more aptly categorized as services, and that they were without the scope of the section.

Here, however, the item which plaintiff alleges is defective—the Hicorex swarf—is not a service. The mere fact that a service is involved in a transaction is not enough to bring a transaction outside of the scope of section 402A.

Thus, the analysis provided by the *Snyder* court concerning the inapplicability of service transactions under strict liability is not relevant here. In the instant case, where the product on which the service was being performed is allegedly faulty, and not the service itself, the rationale behind the exclusion of service transactions in strict liability claims is not available. The *Snyder* court's decision against extending the doctrine of strict liability to service transactions does not anticipate the current situation, but instead specifically applies the rationale to those par-

ties "injured by poor service." 772 F.Supp. at 251. Plaintiffs here do not allege injury by poor service, but instead by a defective product. Defendant's argument that the transaction should be excluded from section 402A as a service transaction is therefore not compelling.

### b. Hitachi Is A "Seller" Under Section 402A

 Hitachi argues that it does not constitute a seller for the purposes of section 402A, as the Hitachi–Kalumetals transaction involved no marketing to the general public. We find that issues of material fact exist concerning this argument, and summary judgment must be denied on these grounds.

 Pennsylvania courts apply section 402A to bailors and lessors as well as to sellers. *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 367, 372 A.2d 736, 738 (Pa.1977). We find that Hitachi's relationship with Kalumetals would traditionally be considered a bailment. *See American Enka Co. v. Wicaco Mach. Corp.*, 686 F.2d 1050, 1053 (3d Cir. 1982) ("A bailment is a delivery or deposit of personalty under an implied or express agreement that at the termination of the bailment the personalty will be redelivered to the bailor, otherwise dealt with according to the bailor's directions, or kept until the bailor reclaims it."); *Wright v. Sterling Land Co.*, 157 Pa.Super. 625, 43 A.2d 614, 615 (Pa.Super.1945) (same).[3] In addition, we are convinced that Hitachi has, in the instant case, undertaken and assumed the special responsibility to the consuming public that is necessary for an entity to be considered a seller (bailor) under section 402A. *See Francioni*, 472 Pa. at 366, 372 A.2d at 738; Comment c, Restatement (Second) of Torts, § 402A.

Hitachi advocates that we adopt a narrow interpretation of what constitutes "on the market" for the purposes of section 402A. We decline to do so. We believe that it is immaterial that the swarf was merely given to Kalumetals for processing. We find that in providing Kalumetals with the swarf, Hitachi

---

3. Specifically, the relationship between Kalumetals and Hitachi constituted a mutually beneficial bailment. "Pennsylvania's appellate courts have said that 'a possibility or chance of expected profit to accrue' from the bailment is sufficient to

make the relationship one for mutual benefit." *American Enka*, 686 F.2d at 1053, *citing Kleckner v. Hotel Strand*, 60 Pa.Super. 617, 620 (Pa.Super.1915).

placed the product in the stream of commerce for the purposes of section 402A. The use made of the swarf by plaintiffs' employees is at least arguably a public use—the "consuming public" to which Hitachi marketed the swarf. A contrary ruling would set a precedent which subverts the public policy underlying the section.

To assist in our determination of whether Hitachi constitutes a seller under 402A, Kalumetals and Hitachi have both referred to the test put forth by the Pennsylvania Supreme Court in *Francioni*, 472 Pa. at 368–69, 372 A.2d at 739. There, the court considered four factors in reaching its decision that section 402A applied to the lessor of a truck. The factors include: (1) whether the defendant is the only member of the marketing chain available to the injured plaintiff for redress; (2) whether the imposition of strict liability will serve as an incentive to safety; (3) whether the defendant is in a better position than the consumer to prevent the circulation of defective products; and (4) whether the defendant can distribute the cost of compensating for any injuries of the consumer resulting from the defective products by charging for it in the defendant's business. *Francioni*, 472 Pa. at 368–69, 372 A.2d at 739. Application of the *Francioni* factors to the instant case precludes us from granting summary judgment on this count.

The first factor weighs heavily toward a finding that Hitachi is a seller. This factor stresses the applicability of section 402A where the defendant is the only member of the marketing chain against whom the plaintiff may bring suit. In the instant scenario, Hitachi and Kalumetals are the only members of the marketing chain. Defendant is thus the only entity available to the plaintiffs for redress.

As to the second factor, it is apparent that the imposition of strict liability would serve as an incentive to Hitachi to provide a more complete and accurate MSDS. Pennsylvania law is clear that the safety of a product "depends on the judgment of those connected to the research, development, manufacture,

marketing and sale of the product." *Cafazzo v. Central Med. Health Servs., Inc.*, 542 Pa. 526, 535, 668 A.2d 521, 526 (Pa.1995). By this standard, Hitachi is the party most responsible for the safety of the swarf.

Furthermore, the second factor does not mandate that Hitachi be in the *best* position to increase safety, as defendant appears to believe, but only that it have some power over the safety level. Thus, it is irrelevant whether Kalumetals may be in as good of a position as Hitachi to increase safety in regard to the processing of the swarf.

The third factor of the analysis is also highly relevant here, as Hitachi was the *only* party to the transaction which was in a position to prevent the circulation of the allegedly defective swarf. Kalumetals was under Hitachi's directive to process the swarf and return it to Hitachi, and thus had no control over the distribution of the product.[4]

The fourth factor, too, weighs in plaintiffs' favor, as Hitachi would be able to distribute the cost of compensating for the defective material through price increases among the related products that it manufactures and sells. While the record is not entirely clear on this issue, it appears that Kalumetals' processing of the swarf was a step in Hitachi's efforts to reclaim rare earth permanent magnets, particularly CoSm and NdFeB. Such efforts are relevant to Hitachi's business of manufacturing cobalt-rare earth powders. Hitachi could distribute the cost of compensating plaintiffs through price increases related to such powders and similar products.

We find that the factors set forth in *Francioni* support the notion that Hitachi constitutes a seller under 402A, and we therefore decline to grant summary judgment on these grounds.

c. *Hitachi's Swarf Constitutes A "Product," Under Section 402A*

■ In addition, there is no merit to Hitachi's claim that the Hicorex swarf does not constitute a product for the purposes of sec-

---

**4.** Here the record is murky. It is unclear whether Kalumetals was expected to return the product directly to Hitachi or to pass it on to the next entity in the recycling chain, the end result being that the product was returned to Hitachi. Our analysis is unaffected by any such distinctions.

tion 402A. Defendant's contention primarily focuses on the fact that the swarf was not placed in the stream of commerce, not that the swarf is not in itself a product. As we have previously stated, by providing the swarf to Kalumetals, Hitachi may be considered a supplier for the purposes of section 402A.

Defendant also contends that a "product" must be mass produced. This argument has little merit. Aside from the fact that neither defendant nor this court has located any Pennsylvania case law to support the assertion, we are not convinced that the undisputed facts of this case indicate that the Hicorex swarf was not in fact mass-produced.[5] We decline to adopt defendant's interpretation of "product" for the purposes of our analysis.

### d. In Pennsylvania, Strict Liability May Be Available To A Plaintiff Operating In A Commercial Setting

 We also reject defendant's argument that strict liability is unavailable to plaintiffs because Kalumetals and Hitachi were operating with equal bargaining power in a commercial setting. We believe that questions of material fact exist concerning whether the parties considered the allocation of the risk of loss due to defects in the product. In addition, we find that the manufacturer's duty to refrain from selling unreasonably dangerous products under 402A is based on safety factors rather than merely ensuring the consumer the benefit of the bargain. As such, and absent a Pennsylvania Supreme Court ruling to the contrary, we believe that section 402A is applicable even where the parties operate in a commercial setting and maintain equal bargaining power.

The cases cited by defendant involve parties which either explicitly negotiated the allocation of the risk of loss based on product defects (see Dep't of Water and Power of the City of Los Angeles v. ABB Power T & D Co., 902 F.Supp. 1178, 1185 (C.D.Cal.1995)), or were otherwise in a position to negotiate and distribute such risk. See General Public

Utilities Corp. v. Babcock & Wilcox Co., 547 F.Supp. 842, 844 (S.D.N.Y.1982) (applying Pennsylvania law). In the instant case, the record lacks any reference to the allocation of risk between the parties. There is also no evidence of record by which we could determine whether the parties were dealing from positions of relatively equal economic strength, or whether the parties bargained for a product which was designed to negotiated specifications. As such, we find that issues of material fact preclude summary judgment.

Furthermore, we believe that defendant's focus on this issues mischaracterizes the role played by section 402A. As the Third Circuit stated in East River S.S. Corp. v. Delaval Turbine, Inc., "[t]he gist of a products liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or his property." 752 F.2d 903, 908 (3d Cir.1985) (quoting Pennsylvania Glass Sand v. Caterpillar Tractor Co. 652 F.2d 1165, 1169 (3d Cir.1981)), aff'd, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Safety, not private allocation of risk, is the defining objective of the section. As the safety issue inherent in section 402A is implicated here, we believe that summary judgment is inappropriate.

### D. Contract Claims

In its motion, defendant puts forth two reasons that plaintiffs' contract claim should be dismissed. First, Hitachi argues that no contract exists between Hitachi and Kalumetals. We believe that issues of material fact exist as to the existence of an oral contract between these parties, and thus summary judgment must be denied on this count.

 Defendant also contends that, as the "gist of the action" in this case is a negligence claim, plaintiffs should be barred from also asserting a contract claim. We disagree. The record is unclear whether the instant case concerns only contract claims,

---

**5.** Furthermore, the cases cited by defendant do not, as defendant would have us believe, mandate that, to be a product, an item must be mass produced, but rather indicate that the mass-pro-

duced nature of an item is indicative that the item may be considered a product. See, e.g., Saloomey v. Jeppesen & Co., 707 F.2d 671, 676–77 (2d Cir.1983).

with any tort claims existing as merely collateral to the contract claims, or whether it involves both tort claims, which arise from a breach of duties imposed as a matter of social policy, and contract claims, which arise from a breach of duties imposed by mutual consensus. We are unable to grant summary judgment on this issue.

 Defendant's argument that plaintiffs' contract claim should be dismissed, as the gist of the action is in tort, misconstrues Pennsylvania law on the subject. Under Pennsylvania law, a breach of contract claim may be construed as a tort claim only if the alleged wrong is the "gist of the action with the contract being collateral." *Phico Ins. Co. v. Presbyterian Medical Servs. Corp.*, 444 Pa.Super. 221, 663 A.2d 753, 757 (Pa.Super.1995). As such, when a tort involves actions arising only from a contractual relationship, the plaintiff is limited to bringing action under contract. *Horizon Unlimited, Inc. v. Silva*, No. Civ.A. 97-7430, 1998 WL 88391, *5 (E.D.Pa. Feb.26, 1998) (applying Pennsylvania law). The opposite situation, however—that if plaintiffs establish a tort claim, they cannot bring with it a related contract claim—does not necessarily hold true. Thus, under the doctrine put forth by defendants, this court would more appropri-

ately dismiss plaintiffs negligence and strict liability claims, and maintain the contract claim. *See, e.g. Neuchatel Ins. v. ADT Sec. Systems, Inc.*, No. Civ.A. 96–5396, 1997 WL 539687 (E.D.Pa. Aug.11, 1997).[6]

A tort claim must have, as its basis, more than a contact claim. *See, e.g., Windsor Securities, Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 664 (3d Cir.1993) ("Breach of contract, without more, is not a tort."). Thus, a tort claim may be dismissed if it merely states the same cause of action that is put forth in a related contract claim. As the Pennsylvania Supreme Court held in *Glazer v. Chandler*, "[t]o permit a promisee to sue his promisor in tort for breaches of contract *inter se* would erode usual rules of contractual recovery and inject confusion into our well-settled forms of actions. Most courts have been cautious about permitting tort recovery for contractual breaches and we are in full accord with this policy." 414 Pa. 304, 308 n. 1, 200 A.2d 416, 418 n. 1 (Pa.1964).

Neither defendant nor this court has located any cases which advocate dismissing a *contract claim* merely because plaintiff has brought a related tort action. We find that, in the instant case, plaintiffs' negligence and contract claims are not simple restatements

---

**6.** In *Neuchatel*, the United States District Court for the Eastern District of Pennsylvania was presented with a set of facts similar to those at hand. There, plaintiffs as insurers and subrogees of a burglarized Rolex watch facility commenced an action against defendants ADT and Wells Fargo, suppliers and monitors of Rolex's security alarm system, and against Coast Security, which supplied the vault from which the property was stolen. Coast Security, in turn, filed a third-party complaint against International Vault, the manufacturer of the vault supplied to Rolex.

The court in *Neuchatel* relied on what it termed "the evident trend in Pennsylvania law toward examining the essence of the claim in considering whether to permit a tort remedy for disappointed expectations in a commercial relationship," *Neuchatel*, 1997 WL 539687, at *8, and ultimately dismissed the plaintiffs' negligence and products liability claims as collateral to plaintiffs' contract claim. *Id.* at *9.

In *Neuchatel*, the plaintiffs alleged that the manufacturer and seller "negligently supplied a vault which did not meet the specifications of the contract and that the vault was defective by reason of its failure to meet the contract specifications." *Id.* Here, the plaintiffs allege that Hitachi supplied Kalumetals with swarf which did

not meet the specifications of the contract, which called for "pure, uncontaminated Hicorex swarf" and "proper and accurate MSDS and shipping manifests." Plaintiffs' Second Amended Complaint at 8. Plaintiffs also contend that "the defendant breached the contract by substituting the product, which is a dangerously flammable and explosive material, for the safely tested sample material." Plaintiffs' Second Amended Complaint at 8. As the court found in *Neuchatel*, such allegations may, at first glance, appear to "reflect frustrated commercial expectations" which are more appropriately addressed under a contractual theory of liability. *Neuchatel*, 1997 WL 539687, at *9.

We find, however, that *Neuchatel* is distinguishable from the instant case. There, plaintiffs' claims of negligence and strict liability were largely dependant on the existence of a contract which provided explicit specifications. Here, however, the contract claim is separate and distinct from the negligence action. Even should this court determine that no contract is at issue, plaintiffs still have claims in negligence and strict liability. Thus, we choose not to grant summary judgment as to plaintiffs' negligence claim on these grounds.

of each other, but separate, individual allegations which stand on their own. The case concerns both a breach of the representations of the quality or suitability of the swarf and a cause of action in tort for the physical injury to plaintiffs' property. The case includes both an obligation imposed by bargain (giving rise to the contract claim) and one imposed by law (giving rise to the tort claims). This is not a case, such as those cited by defendant, where plaintiffs are merely attempting to cloak a contract claim in tortious principles. As such, summary judgment must be denied as to plaintiffs' breach of contract claim.

### E. Spoliation of Evidence

■■■■ Hitachi contends that Kalumetals' failure to preserve certain evidence should constitute an additional basis for summary judgment. While Pennsylvania courts have imposed summary judgment in products liability cases, defendant has not offered any cases involving other causes of action in which this strong sanction was imposed. We find no support for extending the application of this sanction to plaintiffs' claims of breach of contract and negligence.

Addressing the spoliation issue in relation to plaintiffs' strict liability count, we will deny defendant's motion. Hitachi bases the motion largely on the contention that the instant case is analogous to *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3d Cir.1994) and *Schroeder v. Commonwealth of Pennsylvania Dep't Of Transp.*, 710 A.2d 23 (Pa.1998). We disagree.

In both *Schmid* and *Schroeder*, the product which was lost or destroyed was the product manufactured by the defendant. In *Schmid*, for example, the plaintiff was injured by a circular saw and brought suit against the manufacturer of the saw. During inspection of the saw by the plaintiff's expert, the particles that allegedly obstructed the saw guard, and thus allowed the injury to take place, fell out and were not retained. What was lost or destroyed in *Schmid* was part of the product itself—that which made it defective. Similarly, in *Schroeder*, the plaintiff brought suit against the manufacturer of the truck in which her husband was killed.

The truck—the allegedly defective product— was later destroyed prior to the time that the defendant's expert had an opportunity to inspect it.

In the instant case, the product which allegedly caused the explosion—the Hicorex swarf—has been retained and made available to defendant. The evidence which is missing, while possibly important to some of the defenses available to defendant regarding Kalumetals' negligence, is not as significant to defendant's case as the loss of the product on which the plaintiff is basing its claim. Defendant refers us to *Lee v. Boyle–Midway Household Prods., Inc.*, 792 F.Supp. 1001 (W.D.Pa.1992), as an example of a case in which the evidence which was destroyed was not the product itself. We find that defendant's reading of this case is incorrect, and that *Lee* is distinguishable from the instant case.

The container of an allegedly defective product "cannot logically be separated from the contents when the two are sold as a unit." Comment h, Restatement (Second) of Torts § 402A. *See also* 63 Am.Jur. *Product Liability* § 656 (1984) ("No distinction is drawn in the Restatement of Torts 2d § 402A between a product itself and the packaging or container in which the product is supplied, on the ground that the user or consumer purchases the item as an integrated whole"). In *Lee*, the spoliation argument centered around plaintiff's loss of the container which had contained the allegedly defective drain cleaner. As the container may not be considered separate from the product, *Lee* cannot be used an example of a case wherein summary judgment was granted based on the loss or destruction of an item other than the allegedly defective product.

In addition, in *Lee*, the identity of the product was at issue, and although a sample of the product was provided to the defendant, there was no clear indication that the product was actually from the missing container. Here, there is no question that the swarf processed by Kalumetals at the time of the explosion was provided to it by Hitachi. The identity of product issue that created the basis for summary judgment in *Lee* is not present in the instant case.

In *Schmid,* the United States Court of Appeals for the Third Circuit set forth standards for examining spoliation claims. Based on an application of these standards to the record as developed, we believe there is little need for any sanction in this case. In *Schmid,* the court established three factors that must be considered when spoliation of evidence is alleged: (1) "the degree of fault of the party who altered or destroyed the evidence;" (2) "the degree of prejudice suffered by the opposing party; and" (3) "whether there is a lessor sanction [compared to the complete exclusion of evidence] that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid,* 13 F.3d at 79.

In the instant case, Kalumetals' fault is mitigated by the fact that plaintiffs could not allow the accident scene to remain indefinitely, as they needed to return to the operation of their businesses as soon as possible. In addition, perhaps most importantly, Kalumetals preserved the swarf that it alleges was defective. Furthermore, the prejudice to Hitachi is limited because it was provided with an opportunity to investigate the scene of the explosion, including all the evidence relating to the explosion, soon after it occurred. Hitachi was or should have been aware at that time that litigation was, if not imminent, at least a possibility.

 While it is indisputable that Kalumetals, in awareness that it would possibly bring suit in the future, should have retained the log book, flange ends, manifold system, and two inch pipes between each retort tube and the manifold,[7] awarding Hitachi the sanction of summary judgment would ignore Hitachi's responsibility regarding the loss of the evidence. The record does not indicate that Hitachi requested that Kalumetals preserve any of the evidence involved in the explosion. Nor, according to plaintiffs, did Hitachi request an opportunity to inspect the missing items at any time prior to March, 1998. In addition, Hitachi, during its August 1995 visit to Kalumetals' facility, chose not to bring an expert to evaluate the scene of the explosion, or to photograph or otherwise document it.

Products are often destroyed before suit is filed, and we believe that this is an insufficient reason to deny plaintiffs the opportunity to pursue their rights. Defendant is protected in part by the fact that the burden of proof is on the plaintiff, in the products liability aspect of this case, to "prove the product was defective and the defect in the product caused plaintiffs' injuries." *Roselli v. General Elec. Co.,* 410 Pa.Super. 223, 599 A.2d 685, 688 (Pa.Super.1991) (*citing Dietrich v. J.I. Case 'Co.,* 390 Pa.Super. 475, 568 A.2d 1272 (Pa.Super.1990), *appeal denied,* 528 Pa. 610, 596 A.2d 157, and *appeal denied,* 528 Pa. 612, 596 A.2d 158 (Pa.1991)), *appeal granted,* 530 Pa. 645, 607 A.2d 255 (Pa.1992), *appeal discontinued* (Jan. 11, 1993). Furthermore, as plaintiffs were able to produce the allegedly defective product, defendant was not denied its right to challenge whether it was the maker of the product.

We have been unable to find any case calling for summary judgment on grounds of spoliation where the loss was of anything other than the defective product at issue. Furthermore, summary judgment, when granted in cases involving spoliation, is granted not as a sanction itself, but as a consequence of the sanction of the exclusion of evidence.[8] Summary judgment follows because, due to the exclusion of evidence related to the spoliation of that evidence, the party cannot otherwise prove its case. This is not the case here.

---

7. As the United States District Court for the Middle District of Pennsylvania found in *Howell v. Maytag,* "[a] party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence." 168 F.R.D. 502, 505 (M.D.Pa.1996), *citing Baliotis v. McNeil,* 870 F.Supp. 1285, 1290 (M.D.Pa.1994).

8. As the United States District Court for the Eastern District of Pennsylvania recently found, "[t]he spoliation doctrine is unique to product liability for a fairly obvious reason: the existence of a defective product is essential to a product liability case—if there is no defective product, there is no case." *Santore–Umbelina v. Advanced Data Systems, Inc.,* No. Civ.A. 97–5002, 1998 WL 512962, *2 (E.D.Pa., Aug.7, 1998).

An application of the *Schmid* factors leads to the conclusion that, while the destruction of the flange ends, manifold, two-inch pipes, and log book does not require the end of plaintiffs' lawsuit, it may require a jury instruction on the spoliation inference. We do not believe that there is sufficient evidence at this point to determine whether plaintiffs destroyed the missing evidence with the intention of harming Hitachi's defense. We do agree with Hitachi, however, that its ability to defend against plaintiffs' contract and negligence claims may have been prejudiced by the loss of the evidence and that a jury instruction as to the spoliation inference may be appropriate. We invite a motion in limine should defendant feel that such motion is warranted.

Hitachi's motion for summary judgment will be denied in all respects. An appropriate order will follow.

### ORDER

AND NOW, this 14th day of October, 1998, after consideration of the motion for summary judgment of defendant, Hitachi Magnetics Corporation, and briefs on the motion by all parties,

IT IS ORDERED that the motion of defendant, Hitachi Magnetics Corporation, for summary judgment shall be and hereby is denied.